## Payne, Agent, etc., et al. v. Simmons.

(Decided November 16, 1923.)

### Appeal from Boyle Circuit Court.

1. Carriers—Not Relieved of Imposed Duties by Leasing Track to Another.—An owner of a railroad track, including its necessary facilities, which it acquires through a franchise granted by the state, may not relieve itself of the legally imposed duties of a carrier of passengers by leasing its track and facilities to another carrier.

2. Carriers—Lessee of Railroad Track Not Relieved of Legal Duties Because Not Owner of Facilities.—A lessee carrier company, which acquires the right by lease to operate a railroad track, including its facilities, will not be relieved of its legal duties, as regards maintenance of proper facilities, because it is not the owner of the track or the facilities.

3. Carriers—Carrier Detouring Over Route of Another Not Legally Bound to Maintain Proper Station Facilities.—Where by reason of a wreck a passenger train was detoured over the tracks of another carrier, the carrier owning the train was not liable for injuries to a passenger occasioned by improper facilities at a station on the detour, where he voluntarily left the train at a point to which he was not destined, and to which the carrier had not agreed to transport him.

4. Carriers—No Legal Duty to Receive or Discharge Passengers Along Detour Route.—Where, by reason of a wreck, a train was detoured over the line of another carrier, the carrier owning the train was under no legal duty to either receive or discharge any of its passengers along the detoured route.

5. Carriers—Rule as to Lighting of Depots Analogous to that with Reference to Physical Maintenance.—The rule relating to the lighting of depots is analogous to the physical maintenance of both depots and platforms, and both of them rest on the same reasoning.

6. Carriers—No Right to Abandon Train on Detoured Route, in Absence of Delay.—Conceding that a passenger may have been justified in leaving the train before starting on a detoured route over the line of another carrier, due to a wreck, and resuming a subsequent train over the carrier's line on the same ticket, he could not abandon the train at any point he saw proper on the detour, and be entitled to all the duties owing a disembarking passenger at his destination.

7. Carriers—Only Ordinary Care Required as to Passenger at Station.—While the highest degree of care on the part of a carrier is required while the passenger is in the course of transportation on the provided vehicle, only reasonable or ordinary care is required while he is waiting in the carrier's station, or on its platforms, or leaving its premises.

8.   Carriers—Instruction on Contributory Negligence in Injury Action
     Not Warranted by Facts.—In an action by a passenger for in-
     juries received while leaving a station, where there was no ques-
     tion of infancy or other mental defect, and plaintiff was only 63
     years of age, it was error to instruct, in connection with contri-
     butory negligence, that plaintiff was required to exercise such
     degree of care for her own safety as is "usually exercised by
     persons of her age, experience, intelligence, discretion, and condi-
     tion."

     BENJAMIN D. WARFIELD and JOHN W. RAWLINGS for appel-
lants.

     JAY W. HARLAN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On January 6, 1920, the appellee and plaintiff below,
Nancy E. Simmons, resided at West Moreland in the
state of Tennessee. Her married daughter, Mrs. F. W.
Mooningham, who lived at Somerset, Kentucky, had been
visiting her, and on that day the two purchased tickets
from the Louisville & Nashville Railroad Company from
Gallatin, Tenn., to Somerset, Ky., which routed them over
the lines of that company from the beginning point of the
trip to Louisville, Ky., and from thence to Junction City,
where its line crosses that of the Cincinnati, New Orleans
& Texas Pacific Railway Co., (hereinafter referred to as
the Texas Pacific), and from thence over its lines to Som-
erset, the point of destination. Plaintiff and her daughter
arrived in Louisville on time and left there for the latter
part of their journey over the Knoxville branch of the
Louisville & Nashville Railroad Company at about 8
o'clock p. m. on the same day. When their train had
gotten out of Louisville some 15 or 20 miles, the conduc-
tor was informed that a wreck had occurred ahead of it,
between Junction City and Louisville, and that it would
require some considerable time to clear the track for the
passage of trains. He was directed to bring his train
back to Louisville and to make the trip from the latter
place to Junction City by a detour over the tracks of the
Southern Railway Company in Kentucky, (hereinafter
referred to as the Southern Company), running from
Louisville to Danville, and thence over the tracks of the
Texas Pacific Company from the latter point to Junction
City, a distance of about four miles, which detoured trip
could be made in a much shorter time than to wait for the
clearing of the wreck on the tracks of the L. & N. R. R.

Co. But the delay incident to making it caused the train to miss connection with the south bound train over the Texas Pacific line from Junction City to Somerset, plaintiff's destination. To avoid waiting at Junction City for the next train that would take them to their destination, plaintiff and her daughter concluded to leave the detouring train of the Louisville & Nashville Company at Danville, Ky., and to spend the remaining portion of the night and the intervening time with plaintiff's son who resided at that place. When the train stopped at Danville, which it was compelled to do to take water, plaintiff and her daughter alighted therefrom and went into the waiting room of the depot, which was owned and used by the Texas Pacific Company and leased and used by the Southern Company, and there remained some thirty minutes or more till the son arrived with his automobile to take them to his residence, he having been notified of their presence over the telephone. There was a hallway running from the waiting room to the rear of the depot that opened on a street which was, at that point, covered with a porte-cochere, but at the end of the hallway to the pavement by the side of the street there was a down step some six or eight inches. There was a ceiling light constructed in the hallway and also one constructed in the porte-cochere, and it seems that neither of them was lighted at that hour of the night though the waiting room of the depot was well lighted, and from there some light was reflected in the hallway. Plaintiff was crippled in her left leg and had been so for about five years. She traveled with one crutch and a stick. In going through the hallway from the waiting room to the street to take the son's automobile, the latter went in front with plaintiff immediately behind him and the daughter behind her. When they came to the end of the hallway from which the son had stepped on to it plaintiff claims that she did not, on account of the darkness, discover the step to the pavement and she walked on to the pavement without knowing the presence of the step and was thereby caused to career and partially fall, when she was caught by her son, but with the result that her left knee was severely twisted and sprained, from which she suffered considerable pain, and, as she claims, permanent injury.

She first brought this action against the Director General of Railroads and the Texas Pacific Company to recover damages for her injuries upon the ground that the defendant company failed to comply with its legal duty

to have its passenger depot at Danville reasonably
lighted, so as to enable arriving passengers to depart
therefrom with reasonable safety.    Before the answer
was filed the petition was amended by making the Louis-
ville & Nashville Company a defendant.    On motion of
the Texas Pacific Company the action was dismissed as
to it, but issue was made as to the Director General of
Railroads and the defendant, Louisville & Nashville Rail-
road Company, and upon trial there was a verdict in
favor of plaintiff for the sum of $1,000.00, which the court
declined to set aside on a motion made for the purpose,
and on the judgment pronounced thereon defendants
have appealed.    Numerous grounds were relied on in
the motion for a new trial and in brief of counsel against
the propriety of the judgment, chief among which were
(1), error of the court in refusing defendants' motion for
a peremptory instruction offered both at the close of
plaintiff's testimony and at the close of all the testimony
on the grounds that (a), under the facts of the case the
Louisville & Nashville Company was under no duty to
provide stational facilities, including lights, at the depot
in Danville, and (b), if, under the facts, it was compelled
to maintain such facilities, it was not required to do so
for an unreasonable length of time after the departure
of its trains and that plaintiff waited an unreasonable
length of time to make her departure; (2), if mistaken in
ground (1), and the case was a proper submittable one,
then the instructions were erroneous.

Ground (1), sub-division (a), presents a question
which, as developed by the facts of this case, has never
been passed on by this or any other court so far as we
are able to find; nor does counsel on either side cite us
to any text authority or opinion of last resort bearing
directly upon it.    It will be observed that the precise
question is, whether a carrier of passengers is under the
ordinary and well understood duties of such carriers to
maintain for the benefit of their patrons depot facili-
ties, including the requisite lighting, at the various sta-
tions on the line of a road not ordinarily used by it, but
upon which it is only operating its train for a sporatic
and single detouring trip, and when at none of such sta-
tions are any of its passengers destined, nor at none of
them has it the right to take on passengers.    The briefs
for both sides take in a wide range and discuss many
questions relating to the possible happenings to a pas-
senger train while operated by the owner of the line, and

all the necessary facilities for the purpose, such as depots, or by a *lessee* company operating and using in its regular business the line as well as the facilities, and it is upon that class of cases that plaintiff's counsel bottom her right to maintain the action. To follow those various discussions and to determine the law with reference thereto would unduly lengthen this opinion, since it would require at least an abridged treatise on the law pertaining to carriers of passengers, besides throwing but little light on the precise question involved. It will no doubt be conceded by every one that an owner of a railroad track, including its necessary facilities, which it acquires through a franchise granted by the state, may not relieve itself of the legally imposed duties of a carrier of passengers by leasing its track and facilities to another carrier. Likewise, it will be conceded that a lessee carrier company which acquires the right by lease to operate a railroad track, including its facilities, will not be relieved of its legal duties as a carrier of passengers because it is not the owner of the track or the facilities, since in that case it is *appropriating* both the track and facilities in the exercise of its franchise granted to it. It is cases from this and other courts dealing with those questions upon which counsel for plaintiff rely for an affirmance of the judgment. Some of the later ones from this court are: L. & N. R. R. Co. v. Johnson, 168 Ky. 351, and Ashland Coal & Iron Co. v. Elswick, 189 Ky. 507.

In stating the rule requiring carriers of passengers, whether the performance is by the owner or by a lessee, to maintain reasonable depot facilities, including lighting for the required time, it will be found that the duty is extended to stations *appropriated* and *used* by the carrier and for the benefit of its passengers expecting to board a particular train or who have the right to depart from one. Thus in Hutchinson on Carriers, third edition, vol. 2, section 936, the text on the subject says: "It is the duty of passenger carriers by railroad to exercise ordinary care in keeping *their* stations and platforms and the approaches thereto sufficiently lighted so that passengers, and those intending to become such, may enter upon and depart from trains with reasonable safety. Such lights should be maintained for a reasonable time before and after the arrival and departure of trains. There is, however, no absolute rule of law as to what constitutes negligence in regard to the duty of a carrier

to properly light its stations and platforms, for necessarily the character of the lights to be furnished at any particular station will depend upon the character and extent of the business (usually) transacted at such station." (Parenthetical insertion ours). See also 10 Corpus Juris, 919-923; Michie on Carriers, vol. 2, section 2378, and 6 Cyc. 608. It is upon the doctrine so announced that the various cases from this court, including C. N. O. & T. P. Ry. Co. v. Gibbony, 100 S. W. (Ky.) 216; C. & O. Ry. Co. v. Robinson, 135 Ky. 850; L. & N. R. R. Co. v. Payne, 133 Ky. 539, and L. & N. R. R. Co. v. Hobbs, 155 Ky. 133, relied on by plaintiff's counsel, are rested, which in substance is that a carrier of passengers must maintain to the legal standard *its* depot facilities, including lighting where necessary for the reasonable safety of its passengers, either owned or leased by it, and which depots are necessary to and appropriated by it in the conduct of its franchise privilege to engage in the business of a common carrier.

It will be observed that the facts of the instant case are by no means analogous to those calling for the application of the doctrine, and are not within the reasons underlying it and demanding its application. If the Louisville & Nashville Company, under the facts of this case, could in any sense be considered as a lessee of any part of the equipment belonging to the common carriers of the detoured route, it was necessarily confined to the track, or perhaps also to the train. It had no passengers for any of the stations along that route. Neither was it expected to nor could it take on passengers from any station along that route. It only appropriated for the one trip certain parts of the equipage of the two other common carriers in order to carry out its duties to transport *its* passengers with as little delay as possible. Of course, if any negligent accident had happened to the train or the track which it appropriated and operated for the special trip, or if the latter was defective, it would be liable for the consequent injury, but it does not by any means follow that a passenger not destined for any of the intervening stations could impose the additional liability for the improper maintenance of depot facilities by voluntarily leaving the specially detoured train at a point to which he was not destined and to which the carrier had not agreed to transport him. If that duty could be imposed by plaintiff with respect to the depot at Danville, it could likewise be imposed by her with respect to any

other depot over the detoured route.  Not only so, but it could be so imposed as to such depots by any other passenger on the train, or by all of them, and thus interminable obligations would be created without any contractual duty incurring them.  It was under no legal duty (which we have already stated in substance) to either receive or discharge any of its passengers along the detoured route, nor did it propose to make use of any depot or stational facilities for that purpose.  Hence, the very reason for the rule relied on by plaintiff's counsel is wanting, under the facts of this case.  The rule with reference to the lighting of depots is analogous to that with reference to the physical maintenance of both depots and platforms, and both of them rest upon the same reasoning.  With reference to the latter duty, Mr. Hutchinson in his work, *supra*, section 938, says: "The duty of *maintaining* reasonably safe and sufficient stational facilities for the accommodation of *its* patrons devolved primarily upon the railroad company, and it cannot escape liability for injuries resulting from its failure to exercise ordinary care in their *maintenance* by showing that it delegated such duty to a third person, or that the stational facilities used by *it* were owned and controlled by another." (Our italics).

The defendant company in this case was not a seeker of patrons while running over the detoured track and it is doubtful if it could be compelled to accept a passenger from any of the stations along that route.  It was equally not a discharger of passengers along the same route who were not destined for any of the stations on it, there being none such in this case.  If one of them, for personal convenience of his own, saw proper to leave the train, at any of such stations, it would be at his risk after he alighted therefrom.  Indeed the conductor of defendant's train testified in this case that he so stated to plaintiff at the time she manifested her intention to leave the train at Danville, and that testimony is not denied by any witness.  But, be that as it may, we are convinced that the rule invoked by plaintiff and upon which she bases her cause of action does not apply to a passenger who voluntarily leaves the train on a detoured route and, especially so, in the absence of express directions by the conductor for him to do so.

We find nothing in the case of Wilsey v. L. & N. R. R. Co., 83 Ky. 511, relied on by counsel for plaintiff militat-

ing against the foregoing conclusion. That case involved the right of a sick passenger who was traveling on a through ticket to abandon the train at an intermediate point *on the defendant's road* to avoid an unreasonable delay occasioned by a wreck ahead and to resume his journey and be carried on the same ticket on a subsequent train. The train in that case was stopped on account of the wreck and the continuous moving of it was obstructed for an indefinite time. To relieve himself from the inconvenience and discomforts (largely because of his illness), of remaining in the stationary car until the wreck could be removed, it was held by this court that he had the right to leave the train and that it was the duty of the defendant to carry him to his destination for the same consideration paid to it as the original purchase price of his ticket. But the opinion nowhere intimates that in the interim between leaving the train and resuming his journey he continued to remain a passenger and under the protection of the defendant as such. We take this excerpt from the opinion: ''By the contract, it (the carrier) undertakes to make the transit covered by the ticket within a reasonable time; and it is only when it is doing so in a reasonable manner that the passenger has no right to leave the train, and take passage upon another under the original contract. . . . The passenger (in that case) is informed by the train officials that the delay will last several hours; perhaps all night; that they can not tell when it will go on, and they fix no time when he must be present and ready to proceed. Is he in such a case required to remain upon the train all night or for an unknown time? We think not.'' The opinion further states that under the peculiar circumstances of that case there was *good cause* for the plaintiff to leave the train and to subsequently resume his journey on the same ticket. Under the doctrine of that case, if we concede that Mrs. Simmons may have been justified in leaving the train at Louisville before starting on the detoured route and resuming a subsequent one for Junction City over defendant's line on the same ticket, it certainly can not be held that after the detoured trip was undertaken and there were no unnecessary delays on it she could abandon the train at any point she saw proper on that line and be entitled to all the duties of a disembarking passenger at his destination.

The duty to maintain lights at stations is not a statutory one with us, but other analogous ones are imposed

by section 784 of our statutes. An examination of it will show that the analogous duties are imposed upon the owners of the ticket offices, but which as we have seen applies as well to those who appropriate them under lease in the discharge of their regular duties as common carriers. But there is nothing in the statute to indicate that it was the purpose of the legislature to impose the duties therein enumerated upon a detouring company making only a special trip and having no passengers destined for any of those stations. Indeed it would be an unheard of hardship to require such a detouring carrier to see to it that all passenger depots along the detoured line, as well as their platforms, were in a reasonably safe physical condition for the reception and discharge of passengers, and to be liable for any injury suffered by one who saw proper to alight at any of those depots for his personal convenience, although the train was at that time engaged in completing the detoured journey with no impediment in its way requiring a suspension thereof. By the same token the detouring carrier should not be required to maintain lighted stations along the detoured line as a duty owed to any of its passengers.

Under subdivision (b), of ground (1), defendants contend that in no event were they required to keep the depot at Danville lighted more than a reasonable time after the departure of its train, as was held by this court in the case of Ward v. L. & N. R. R. Co., 168 Ky. 826. In this case plaintiff was not injured until the elapse of as much or more than thirty minutes after the train departed, and it would seem that there was merit in this contention. But, in view of our foregoing conclusion on sub-division (a), of the same ground, we deem it unnecessary to elaborate the question.

It is contended under ground (2), that the court erroneously instructed the jury that it was the duty of defendants "to observe the highest degree of care which prudent persons engaged in the same business are accustomed to observe, to have and maintain its station, and platform, and grounds in a reasonably safe condition for the use of passengers in coming to or leaving their station, and to have and to maintain their station, platform, and grounds, reasonably well lighted." The great weight of authority and, indeed, every case, except perhaps a few sporadic ones, require of carriers only the exercise of reasonable or ordinary care to provide and maintain such imposed duties. Michie on Carriers, vol.

2, section 2378; Hutchison on Carriers, third edition, vol. 2, section 938, and 10 Corpus Juris, title "Carriers," section 1300, pages 861-2. An examination of those authorities will show that while the highest degree of care on the part of the carrier is required while the passenger is in the course of transportation on the provided vehicle, "only reasonable or ordinary care being required while he (passenger) is waiting in the carrier's station or on its platforms, or leaving its premises."

Another objection to the instructions under this ground is that the one on contributory negligence required plaintiff to exercise that degree of care for her own safety as is "usually exercised by persons of her age, experience, intelligence and discretion and condition." There was no question in the case of infancy or other mental defect. The plaintiff was only 63 years of age at the time of the accident and was in possession of her normal mental facilities so far as the record shows. We can, therefore, find no basis for the qualification of the instruction, the effect of which was to possibly mislead the jury. If upon another trial the testimony should be substantially the same as that on the first one the court will sustain defendant's motion for a peremptory instruction in their favor; but if the testimony should develop a case requiring its submission to the jury, the court will modify the instructions referred to as herein indicated.

For the reasons stated, the judgment is reversed with directions to sustain the motion for a new trial and for proceedings consistent with this opinion. Whole court sitting.